IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Allison Panetta,                )
                                )
        Plaintiff,               )    Case No. 1:09-CV-71
                                )
    v.                          )
                                )
The Sheakley Group, Inc.,       )
et al.,                         )
                                )
        Defendants.              )

O R D E R

This matter is before the Court on the motion for summary judgment filed by Defendants The Sheakley Group, Inc. and ProProcure US LLC (Doc. No. 29). For the reasons set forth below, Defendants' motion for summary judgment is well-taken and is **GRANTED**.

I. Background

Plaintiff Allison Panetta alleges that she was terminated from her position as an executive vice president of ProProcure US LLC ("ProProcure") in violation of the Pregnancy Discrimination Act and the Ohio Civil Rights Act.[1]

Steve Paradiso formed ProProcure in 2006 as a software

---

[1] Plaintiff also alleged in the amended complaint that Defendants terminated her in retaliation for complaining about unlawful discrimination in violation of Title VII of the Civil Rights Act of 1964 and the Ohio Civil Rights Act. In response to Defendants' motion for summary judgment, however, Plaintiff now concedes that the decision to terminate her employment preceded her complaints. Accordingly, Plaintiff concedes that summary judgment is appropriate on her retaliation claims.

1

company that would connect buyers of promotional products to suppliers of such products.  In July 2006, Paradiso recruited Plaintiff from her job with a company called Marketing Innovations International.  Plaintiff had previously worked for Paradiso at another marketing company called Cyrk.  Initially, Plaintiff and Paradiso were ProProcure's only employees.  The principal investors in ProProcure were the Sheakley Group, Inc., Larry Sheakley, Derek Block, and Frank Treanor.  Block became the chief operating officer ("COO") of ProProcure and Paradiso was the president.

Technically, Plaintiff was a consultant for ProProcure from approximately July 2006 to November 2006.  Plaintiff became pregnant at around the end of June 2006 and it does not appear to be disputed that Paradiso and Block became aware of her pregnancy by October 2006 at the latest.  Plaint. Dep. at 125-26. Plaintiff testified that, upon learning she was pregnant, and then several times thereafter, Paradiso said to her that "she better not change."  Id. at 145-47.

On December 1, 2006, Plaintiff signed an employment agreement with ProProcure naming her executive vice-president of the company at a salary of $145,000 per year.  Doc. No. 31.

Plaintiff was on maternity leave from early March 2007 until approximately the end of May 2007.  While on maternity leave, Plaintiff received her full salary and benefits.  Paradiso

Aff. (Doc. No. 29-8) ¶ 3. Plaintiff gave birth on March 3, 2007. Plaintiff received a personal gift from Paradiso and his wife and flowers and a note of congratulations from ProProcure. Plaint. Dep. at 170-71.

It is not disputed that ProProcure had no sales, and hence no revenue, during the entire period of Plaintiff's employment. At about the time Plaintiff returned from maternity leave, ProProcure hired William Bok as its COO to move the business forward. Additionally, in August 2007, in an attempt to generate more revenue, ProProcure hired Justin Warren as a sales representative at a salary of $48,000 per year. These additions, however, did not improve ProProcure's sales performance.

Plaintiff claims that when she returned to work, Paradiso again commented that she had better not change. Additionally, Paradiso allegedly told Plaintiff that she could have one child but not two. Plaintiff also claims that Bok made the same comments to her and was not joking. Plaint. Aff. (Doc. No. 35-19) ¶ 2.

By the fall of 2007, Bok, Block and Paradiso determined that ProProcure was too top-heavy with executive salaries and would need to cut expenses to stay viable. Bok testified that they agreed to eliminate Plaintiff's job as the most cost-effective move. Bok Dep. at 41-46. On November 20, 2007, Bok notified Plaintiff that she would have to sign on thirty new

clients and generate $30,000 in monthly revenue by December 31, 2007 or she would be terminated. Bok confirmed this notification to Plaintiff in an email dated November 30, 2007:

> You asked for written confirmation of our November 20th conversation. In summary, Allison was hired on December 1, 2006, and was responsible for duties and responsibilities for selling the ProProcure Enterprise Platform and the Leap Marketplace. As of today's date, Allison has not produced any revenue for the Company. Allison and the ProProcure team on September 14, 2007 were given and agreed to specific goals of 30 unique buying companies and a $30,000 monthly run rate by the end of the fourth quarter, December 31, 2007. Again, Allison failed to produce any revenue for the company as of this date. Therefore, Allison is receiving a final warning on performance and her failure to perform the duties and responsibilities assigned to her. Should Allison fail to meet her goals by the end of the fourth quarter, December 31, 2007, her employment will be terminated.

Doc. No. 35-10. Prior to this time, Plaintiff had never been notified that her performance was not meeting expectations. Plaint. Aff. ¶ 5. In his deposition, Bok all but admitted that it was impossible for Plaintiff to meet these sales goals in the that time frame. Bok also admitted that no else at ProProcure was put on performance notice or terminated for failing to achieve the goals listed in this email. Bok Dep. at 46-47.

Interestingly, Plaintiff's impending termination was the subject of email correspondence between The Sheakley Group's chief financial officer, Tom Pappas, and Eleni Liston, Sheakley's human resources director, some five days before Bok put Plaintiff on performance notice. On November 15, Pappas wrote:

4

> It looks like ProProcure is going to do away with
> Allison's position with the company, which involves a
> layoff. I read her agreement and I think that we are
> okay. I would like for you to read her agreement and
> tell us if we are okay. Please respond to all of us
> as to your thoughts.

Doc. No. 35-9, at 3.[2] Liston wrote the following to Bok in response to Pappas's email the following day:

> After reviewing Allison's Employment Agreement, and if
> we are laying her off due to job elimination, I do not
> find where we are protected for this particular cause.
>
> Section 9.5 discusses if the Employer determines that
> the Business of the Employer is <u>unprofitable and should
> be terminated or otherwise discontinued</u>, then we can
> terminate employment. In this instance, the Employer
> would be required to pay Employee salary compensation
> the earlier date of December 31, 2009 or four months
> after the termination. Since the business is not being
> terminated as stated in the agreement, than [sic] this
> would, in fact, not be the cause.
>
> In Section 9.1, the Employment Agreement enables
> Employer to terminate Employee for the following
> reasons: performance, theft, alcohol use, indictment,
> not following discrimination policies, performing acts
> detrimental to the Company, any breach of contract, not
> meeting goals, or term of employment after 11/30/2009.
> Company would then only be liable to pay any unpaid
> salary compensation, bonus payments earned for any full
> calendar year prior to date of termination, any accrued
> benefits.
>
> If terminated for any other reason, other than the
> employee's disability, "cause" (listed above), or the
> closure of the business, we would be responsible for a
> severance package to the Employee from the date after
> the termination and ending on the earlier of December
> 31, 2009 or twelve months after the date of
> termination.
>
> Based on the information given to me by you and Tom

---

[2] Pappas sent this email to Bok and Paradiso as well.

> Pappas, <u>we are only eliminating Allison's position "for no cause" other than job elimination</u>. Since we are not terminating the business, then I believe we would be obligated to honor the contract and a pay [sic] twelve month severance payment of $145,000.

<u>Id.</u> at 2-3 (emphasis in second paragraph in original; emphasis in fifth paragraph added).

It is unlikely that anyone was surprised when Plaintiff was unable to meet the sales goals set forth in Bok's email. On January 3, 2008, Plaintiff received a letter from Liston notifying her that her employment would be terminated as of January 4, 2008 "for failure to meet performance goals." Doc. No. 35-11, at 2. This lawsuit followed.

Plaintiff's original complaint, filed February 2, 2009, asserted claims against Defendants for pregnancy discrimination and retaliation pursuant to the Ohio Civil Rights Act. Plaintiff received a right to sue letter from the EEOC on April 16, 2009 and, on July 10, 2009 filed an amended complaint adding pregnancy discrimination and retaliation claims pursuant to Title VII and the Pregnancy Discrimination Act. As indicated above, however, Plaintiff now concedes that dismissal of her retaliation claims on summary judgment is appropriate.

After discovery concluded, Defendants filed the instant motion for summary judgment, which has been briefed and is ready for disposition.

## II. Summary Judgment Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The evidence presented on a motion for summary judgment is construed in the light most favorable to the non-moving party, who is given the benefit of all favorable inferences that can be drawn therefrom. United States v. Diebold, Inc., 369 U.S. 654 (1962). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)(emphasis in original). The Court will not grant summary judgment unless it is clear that a trial is unnecessary. The threshold inquiry to determine whether there is a need for trial is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 250. There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. Id.

The fact that the weight of the evidence favors the

moving party does not authorize a court to grant summary judgment. Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 472 (1962). "[T]he issue of material fact required by Rule 56(c) . . . to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or a judge to resolve the parties' differing versions of the truth at trial." First National Bank v. Cities Service Co., 391 U.S. 253, 288-89 (1968).

Moreover, although summary judgment must be used with extreme caution since it operates to deny a litigant his day in court, Smith v. Hudson, 600 F.2d 60, 63 (6th Cir.), cert. dismissed, 444 U.S. 986 (1979), the United States Supreme Court has stated that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). According to the Supreme Court, the standard for granting summary judgment mirrors the standard for a directed verdict, and thus summary judgment is appropriate if the moving party establishes that there is insufficient evidence favoring the non-moving party for a jury to return a verdict for

that party.  Id. at 323; Anderson, 477 U.S. at 250.

Accordingly, summary judgment is clearly proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial."  Celotex Corp., 477 U.S. at 322.  Significantly, the Supreme Court also instructs that the "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion" against a party who fails to make that showing with significantly probative evidence.  Id.; Anderson, 477 U.S. at 250.  Rule 56(e) requires the non-moving party to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial."  Id.

Further, there is no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or similar materials negating the opponent's claim.  Id.  Rule 56(a) and (b) provide that parties may move for summary judgment "with or without supporting affidavits."  Accordingly, where the non-moving party will bear the burden of proof at trial on a dispositive issue, summary judgment may be appropriate based solely on the pleadings, depositions, answers to interrogatories, and admissions on file.

### III. Analysis

Plaintiff's federal and state pregnancy discrimination

claims may be analyzed together since it has been long-established that they are subject to the same evidentiary standards. Tysinger v. Police Dept. of City of Zanesville, 463 F.3d 569, 572 (6th Cir. 2006). Defendants proffer three reasons why summary judgment in their favor is appropriate. First, they contend that Plaintiff cannot establish a prima facie case of discrimination because she cannot establish a nexus between her pregnancy and her termination. Second, Defendants contend that Plaintiff cannot establish that the reason she was fired, namely the need to save costs by eliminating her position, was a pretext for discrimination. Third, and finally, Defendants argue that Plaintiff's Pregnancy Discrimination Act claims should be dismissed because ProProcure does not meet the numerosity of employees requirement in order to be considered an "employer" under Title VII.

In a case such as this one without direct evidence that the employer illegally discriminated against the plaintiff with regard to an adverse employment action, a circumstantial case of discrimination can be established through the traditional McDonnell-Douglas burden-shifting format. In a pregnancy discrimination case, the plaintiff must prove that: 1) she was pregnant; 2) she was qualified for her job; 3) she suffered an adverse employment action; and 4) there is a nexus between her pregnancy and the adverse employment action. Cline v. Catholic

Diocese of Toledo, 206 F.3d 651, 658 (6th Cir. 2000). If the plaintiff establishes these elements, the employer must come forward with a legitimate, non-discriminatory reason for its actions. Id. If the employer meets this burden, the plaintiff must provide evidence that the employer's reason is a pretext for discrimination. Id. The plaintiff can meet this burden by showing that the employer's reason has no basis in fact, did not actually motivate the employer, or was insufficient to motivate the adverse action. Tysinger, 463 F.3d at 576. In Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133 (2000), the Supreme Court held that in some cases, judgment as a matter of law for the employer may be appropriate even if the plaintiff adduces evidence that the employer's reason is false, if "no rational factfinder could conclude that the action was discriminatory." Id. at 148. "For instance," the Court stated, "an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, non-discriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted evidence that no discrimination had occurred." Id.

The Court observes initially that Plaintiff's evidence of a nexus between her pregnancy and her termination is exceedingly weak. As Defendants note, ProProcure signed

11

Plaintiff to a high-paying employment contract knowing that she was pregnant at the time and provided her with three months maternity leave at full-pay and benefits. Additionally, Plaintiff received congratulatory gifts and notes from both Paradiso and ProProcure, thus suggesting that they were not displeased about her pregnancy. Compare with Asmo v. Keane, Inc., 471 F.3d 588, 594 (6th Cir. 2006)(finding that "most significant" evidence of pretext was supervisor's silence after plaintiff announced her pregnancy). Moreover, the temporal proximity between the time Plaintiff was hired and the time she was effectively terminated - approximately eleven months - strongly suggests no connection between the two events. Compare with Diaz v. Westin Hotel, No. 1:06-CV-108, 2007 WL 764296, at 11 (S.D. Ohio Mar. 9, 2007)(Beckwith, C.J.)(finding no nexus where plaintiff was terminated approximately six months after returning from maternity leave). Similarly, the "same actor inference" strongly suggests that having hired Plaintiff when she was pregnant, Paradiso and Block would not have been motivated to fire Plaintiff because she was pregnant. Buhrmaster v. Overnite Transp. Co., 61 F.3d 461, 464 (6th Cir. 1995)("An individual who is willing to hire and promote a person of a certain class is unlikely to fire them simply because they are a member of that class."). About the only evidence propping up a nexus between Plaintiff's pregnancy and her termination is Paradiso's comments

about not changing.

There is also a considerable issue whether ProProcure meets Title VII's numerosity of employees requirement. Nevertheless, given the involvement of Sheakley executives in Plaintiff's termination, a reasonable factfinder could conclude that Sheakley exercised control over ProProcure's employees, and that, therefore, the two entities were a single employer for purposes of Title VII. See Swallows v. Barnes & Noble Book Stores, Inc., 128 F.3d 990, 994 (6th Cir. 1997)(stating that "control over labor relations is a central concern" in determining whether two companies are a single employer under Title VII).

With the foregoing comments as a preface, the Court will assume that Title VII's numerosity requirement is satisfied and that Plaintiff can establish a prima facie case of pregnancy discrimination. The Court concludes, however, that summary judgment in Defendants' favor is warranted because, although there is evidence that Defendants' reason for terminating Plaintiff is pretextual, the evidence of pretext as it relates to Plaintiff's pregnancy is weak. Reeves, 530 U.S. at 148. On the other hand, the evidence is strong that Defendants "lied to conceal a reason that was discreditable but not discriminatory." Chen v. Dow Chem. Co., 580 F.3d 394, 400 n.4 (6th Cir. 2009) (quoting Forrester v. Rauland-Borg Corp., 453 F.3d 416, 417 (7th

Cir. 2006)).

Defendants offer the need to reduce expenses as the reason Plaintiff was terminated and it is clear that a reduction-in-force was necessary. ProProcure had generated zero dollars in revenue and was top-heavy with executive salaries. Indeed, the record establishes that salaries were ProProcure's major operating expense. It is unreasonable to believe that when a group of executives meet to consider reducing expenses, any member of that group will agree that eliminating his position is in the best interests of the company. Therefore, it is not surprising that Block, Bok, and Paradiso did not decide to eliminate one of their positions to reduce expenses. That left Plaintiff and Warren as the vulnerable employees. Between the two, Plaintiff's position was the obvious one to eliminate given her $145,000 salary versus Warren's $48,000 salary. Thus, eliminating Plaintiff's position was a sound decision from a fiscal standpoint.

There was only one problem with implementing this decision – Plaintiff's employment contract. This is where the evidence points so strongly against Plaintiff's pregnancy as the reason for her termination and so strongly towards another "discreditable reason" for her termination. Defendants clearly fabricated Plaintiff's performance problems. Plaintiff had not previously been advised that her performance was an issue and Bok

14

basically admitted that he imposed on her virtually unattainable goals for which no one else at ProProcure was held accountable.

The emails between Pappas, Liston, Bok, and Paradiso make clear why this was done - unless Plaintiff could be terminated for cause, ProProcure would have to pay her a year's salary. Liston's November 16 email admits that at that time, ProProcure did not have cause to terminate Plaintiff and that, consequently, she would be entitled to severance pay. Tellingly, two of the grounds Liston mentioned where Plaintiff could be terminated for cause were performance and failure to meet goals. See supra, at 5. Although Plaintiff's performance had not been an issue heretofore, only four days after Liston's email, Bok suddenly advised Plaintiff that her performance was unacceptable and gave her impossible goals to meet. Plaintiff's termination letter specifically states that she was terminated for her "failure to meet performance goals." Doc. No. 35-11. Accordingly, the record could not be more clear that Defendants generated Plaintiff's performance problems as a pretext to terminate her for cause to avoid complying with their severance pay obligation.

Thus, we have in this case that rara avis, a smoking gun. Unfortunately for Plaintiff it is for a claim (breach of contract) that has not been pled. However, in the light of the extremely weak nexus between Plaintiff's pregnancy and her

15

termination, and the very strong evidence that a reduction-in-force was necessary, but that Defendants needed a pretext to avoid paying severance to Plaintiff, a reasonable juror could only find that Plaintiff's pregnancy was not the reason for her termination.  Therefore, pursuant to Reeves, summary judgment in Defendants' favor is appropriate.

## Conclusion

For the reasons stated, Defendants' motion for summary judgment is well-taken and is **GRANTED.**


**IT IS SO ORDERED**


Date April 14, 2010            s/Sandra S. Beckwith
                         Sandra S. Beckwith
                    Senior United States District Judge